IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>ROYANN L. SCHMIDGALL,<br><br>     Defendant. | 4:12-CR-3047<br><br>FINDINGS ON LOSS CALCULATION |

  This case is before the Court with respect to the loss calculation for purposes of sentencing. As directed by the Court in its Amended Order on Sentencing Schedule (filing 31), the parties submitted a statement of uncontroverted facts (filing 36), and briefed the matters on which they disagree (filings 37 and 38). The government submitted an index of evidence in support of its position (filing 39), and a hearing was held at which additional evidence was adduced and submitted (filings 41, 42, and 45). The parties have also filed post-hearing briefs (filings 46 and 47).

  While the parties agree on most of the facts, they disagree about whether some of the defendant's alleged conduct between 2004 and 2008 should be included in the loss calculation. The Court has considered the parties' arguments, along with the evidence filed with the Court and adduced at the evidentiary hearing. Based on the evidence before the Court, the Court agrees with the government that the losses between 2004 and 2008 should be included in the loss calculation for purposes of determining the defendant's offense level and ordering restitution.

BACKGROUND

  The defendant was the office manager for Nebraska Pulmonary Specialties (NPS) and was solely responsible for processing the payroll. As part of that duty, the defendant administered employees' "paid time off" (PTO). Employees accrued vacation and short-term sick leave as PTO, on a per-paycheck basis, and could receive payment for unused PTO hours. The defendant paid out those hours to employees at their normal hourly rate of pay. Filing 36 at 1.

  Between 2004 and 2011, the defendant paid herself for PTO hours that she did not have available, and she paid herself at a rate exceeding her hourly rate of pay. Filing 36 at 4. The parties agree that by January 1, 2009,

the defendant knew that she had no PTO hours available, so all payments made after that date should be included in the loss calculation. Filing 36 at 4. That total is $419,500. Filing 36 at 4. The parties disagree about payments made between 2004 and 2008. The government argues that for those payments, the calculated loss should include the difference between the defendant's rate of pay and the hourly rate at which her PTO was paid, resulting in an additional loss of $122,395.25. Filing 37 at 5. The defendant contends that the pre-2009 loss is not "relevant conduct" to the offense of conviction. Filing 38 at 5-7. And the defendant questions the evidence that the government relies upon to establish that the defendant was overpaid. Filing 38 at 6-7.

The defendant was a salaried employee. The government's calculations are based on the difference between the defendant's hourly "salary rate" (i.e., her biweekly pay period salary divided by 80 hours) and the rate at which she was compensated for the unused PTO that she claimed.[1] *See* filing 45-1.[2] The evidence establishes that the defendant compensated herself for unused PTO at a rate of $50 or $100 per hour (although a $60 rate was used on one occasion). Filing 45-1; *see also* filings 39-2, 39-6, and 39-7. The rate was $50 per PTO hour through late 2006, excluding the one instance of $60 per hour; the rate increased to $100 per hour in October 2006 and remained there for the remainder of the relevant timeframe. Filing 45-1. The defendant's annual salary, however, was $70,434 between 2004 and 2006 (not including bonuses). Filing 39-5 at 2. It was increased to $92,333 in 2007. Filing 39-5 at 4. But using either figure, her prorated hourly salary rate (assuming a 40-hour work week) would not have exceeded $44.44 per hour. Filing 45-1.

Three of the physician members of NPS—Drs. William Johnson, John Trapp, and Anup Chakraborty—testified at the evidentiary hearing that neither they nor any of the other doctors at NPS authorized a different rate of compensation for the defendant's PTO hours. Johnson testified that employees were expected to take PTO payouts at a rate consistent with their hourly wage, as calculated from their salary. And Abbie Edwards, who took over as operations manager for NPS after the defendant was fired, said she reviewed NPS's available financial records and that for at least part of the relevant timeframe, employees *other* than the defendant who took PTO payouts (including salaried employees) were paid for PTO at the same rate as

---

[1] Four instances were coded as long-term sick leave, rather than a vacation payout; the Court does not view the distinction as meaningful in this context.

[2] Filing 45-1 is the government's Exhibit 14. A version of that exhibit (filing 39-15) was filed before the evidentiary hearing, but it was replaced by a revised Exhibit 14 (filing 45-1) at the hearing. The Court has relied upon the revised version.

- 2 -

their calculated hourly wage. Edwards said that the defendant had instructed her on how a salaried employee's hourly wage was to be calculated: dividing their salary per biweekly pay period by 80 hours. Employees other than the defendant were compensated for PTO based on that formula, but an override rate was used for the defendant's compensation, and Edwards explained that the payroll systems did not create an override rate by default: the override rates were created by manual entries in the payroll system, for which the defendant was responsible.

## ANALYSIS

The loss calculation at issue here is useful primarily for two purposes. First, in determining the offense conduct, the offense level is increased based on the amount of the loss. U.S.S.G. § 2B1.1(b)(1). Second, in the case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss. U.S.S.G. § 5E1.1; *see also* 18 U.S.C. § 3663A(a)(1) and (c)(1)(B). The Court recognizes that although the gross amounts of theft loss for sentencing purposes and victim loss for restitution purposes are often calculated in the same manner, the two determinations serve different purposes and thus may differ depending on the relevant facts. *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010). Restitution may only be awarded for the loss caused by the specific conduct that is the basis of the offense of the conviction. *United States v. DeRosier*, 501 F.3d 888, 896 (8th Cir. 2007). But restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, even if the defendant is not convicted for each fraudulent act in the scheme. *Lange*, 592 F.3d at 907; *DeRosier*, 501 F.3d at 897. The Court sees no basis, at this point, to distinguish between the loss calculation for purposes of determining the specific offense characteristics and the victim's loss.

## RELEVANT CONDUCT

The primary dispute between the parties at this point is the scope of the defendant's "relevant conduct" within the meaning of U.S.S.G. § 1B1.3(a)(2). Most of the facts have been agreed to by the parties. Pursuant to § 1B1.3(a)(2), the defendant's specific offense characteristics shall be calculated on the basis of all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant, and all such acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." The offense of conviction here is Count 15 of the indictment, which concerned a PTO payment made in March 2011. *See*, filing 1 at 3; filing 29 at 4-5. But a "course of conduct" or "common scheme or plan" may include conduct

- 3 -

occurring before or after the timeframe of the indictment, although the time interval between the offenses may be considered in determining whether other conduct is "relevant conduct" within the meaning of the Guidelines. *See* § 1B1.3 cmt. n.9.

Factors to be applied in determining whether conduct is "relevant conduct" include temporal and geographical proximity, common victims, common scheme, charge in the indictment, and whether the allegedly relevant conduct is used to prove the instant offense. *See United States v. Hernandez,* 712 F.3d 407, 409 (8th Cir. 2013); *see also* § 1B1.3 cmt. n.9.

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

§ 1B1.3 cmt. n.9(A). And offenses that are not part of a common scheme or plan may nonetheless be considered part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." § 1B1.3 cmt. n.9(B).

> Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity.

> The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

*Id.*

Based on the evidence before the Court, the Court finds that the overpayments the defendant directed to occur between 2004 and 2008 should be included in the loss calculation, as they were relevant conduct—specifically, they were part of a common scheme or plan with the offense of conviction. Even assuming that the defendant had (or reasonably believed herself to have) PTO hours to be paid out, she overpaid herself, and those overpayments involved the same offender, the same victim, the same purpose, and a similar modus operandi to the offense of conviction and the other post-2008 conduct. In all the transactions at issue, the defendant defrauded her employer by directing it to pay her wages she had not earned. *Cf., United States v. Smith*, 705 F.3d 1268, 1275 (10th Cir. 2013); *United States v. Buck*, 324 F.3d 786, 796-97 (5th Cir. 2003); *United States v. Williams*, 10 F.3d 910, 913-14 (1st Cir. 1993). The defendant characterizes the scheme to defraud as being that the defendant "received benefits when she had none." Filing 38 at 4-5. But the essence of the offense in this case is that the defendant committed wire fraud by directing NPS's third-party payroll providers to overcompensate her. The Court does not see a meaningful difference between claiming PTO *hours* that had not been earned and claiming PTO hours *at a rate of pay* that had not been earned.

The 2004-2008 conduct was also part of the same course of conduct as the later offense. The record shows a long sequence of repeated transactions that were essentially identical except for the amount of hours claimed and the rate of compensation. Once the defendant started overpaying herself through PTO compensation, she rarely went more than a few weeks without doing so, and by mid-2006 she was doing it nearly every pay period. In short, the transactions were clearly similar, regular, and frequent, and sufficiently connected to establish a course of conduct.

The defendant argues that because there is little evidence of the actual terms of the employment agreement between the defendant and NPS, there are questions as to whether she might have actually had the authority to set her own rate of reimbursement for PTO. Filing 47 at 4. Because there is no written evidence of the defendant's employment agreement, "what was agreed to is left to the recollection of the parties about the terms of an oral agreement that was made in 1994 [sic]" and "there is no clear evidence that

- 5 -

[the defendant] knew that the agreement was otherwise and knowingly requested payment for which she was not entitled." Filing 38 at 6. In other words, the defendant does not just question whether the alleged overpayments were part of the same scheme to defraud—the defendant seems to question whether they were even fraudulent.

But the evidence establishes that no one expressly authorized the defendant to compensate herself at the rates she did. The Court is not willing to accept the defendant's implicit proposition that an administrative professional at a limited liability corporation can be legally authorized to substantially increase her own salary simply because no one told her she couldn't. Nor is there any reason to think that an experienced, competent professional like the defendant would believe herself to be entitled to PTO compensation at a rate considerably higher than her actual salary.[3] However the defendant believed that her rate of PTO reimbursement was to be calculated, it seems unlikely that her actual salary would result (or that she would believe it to result) in the nice, round $50 or $100 per hour figures at which her PTO was reimbursed.[4] *See* filing 45-1.

Simply put, the only basis for those numbers to be used is that the defendant made them up and entered them herself. And there is no credible basis on which she could have thought that it was lawful for her to do so. The only reasonable explanation for these payment records is that the defendant was stealing. The Court finds the evidence sufficient to prove that the defendant knowingly defrauded NPS by overcompensating herself between 2004 and 2008, and that was relevant conduct to the offense of conviction.

LOSS LEVEL FOR SPECIFIC OFFENSE CHARACTERISTICS

Having found that the defendant's excess PTO payments from 2004-2008 were relevant conduct, the Court must determine the amount of the loss

---

[3] It is also worth noting that the defendant was interviewed by Trapp, Chakraborty, and Johnson shortly after the overpayment was discovered, and a recording of that conversation is in the record as Exhibit 13. When confronted about the amounts of money involved, the defendant conspicuously failed to assert that she had been authorized, either implicitly or explicitly, to compensate herself for PTO hours at a higher rate.

[4] The Court notes that when the defendant actually used vacation hours—that is, actually took a paid vacation—she also compensated herself for that time at inflated rates. Filing 45-1 at 3-4. It is not credible that the defendant would have believed she was authorized to compensate herself for PTO at $50-$100 per hour, but it is even *less* credible that she would have believed she should be paid more while on vacation than while actually at work.

- 6 -

for purposes of the specific offense characteristics under § 2B1.1(b)(1).[5] The burden is on the government to prove the factual basis for a sentencing enhancement by a preponderance of the evidence. *United States v. Peroceski,* 520 F.3d 886, 889 (8th Cir. 2008). For purposes of § 2B1.1(b), loss is calculated as the greater of the actual or intended loss. Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i). And "reasonably foreseeable pecuniary harm" is further defined as that harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense. *Id.* cmt. n.3(A)(iv). Intended loss, by comparison, includes any "pecuniary harm that was intended to result from the offense," including harm that was "impossible or unlikely to occur." *Id.* cmt. n.3(A)(ii). If the actual or intended loss cannot reasonably be determined, the Court may use the gain to the defendant as an alternative measure of loss. *Id.* cmt. n.3(B). Ultimately, this Court needs to make a "reasonable estimate of the loss." *Id.* cmt. n.3(C); *United States v. Rice,* 699 F.3d 1043, 1049 (8th Cir. 2012).

  The defendant argues that it is not clear how her actual hourly rate of reimbursement was to have been calculated. Filing 38 at 6. But the PTO payout rate was calculated for every other employee of NPS the same way, and there is no evidence that the defendant was an exception. While there is no evidence definitively establishing how the PTO salary rate for the defendant, in particular, was to be calculated, the objective here is not to prove damages to a mathematical certainty, or even to prove the exact terms of a contract—it is to make a reasonable estimate of the actual or intended loss caused by the offense. Using the same formula that was used for every other employee is, in fact, the only reasonable method of determining what the defendant *should* have been paid for her available PTO hours. And, of course, Johnson testified that the defendant was also supposed to have used that formula for herself. The Court finds that the government's estimate of the loss is reasonable.

## RESTITUTION

  The same reasoning applies to the Court's determination of loss for purposes of restitution. The government has the burden to demonstrate the amount of such loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). Restitution is compensatory, not punitive, and in a fraud case, it is limited to the actual loss directly caused by the defendant's criminal conduct in the

---

[5] Based on the parties' arguments, it seems apparent that their primary concern is the eventual award of restitution, rather than the offense conduct: both parties' loss calculations would result in a 14-level increase in the offense level. *See* § 2B1.1(b)(1).

course of the scheme alleged in the indictment. *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012). The amount of restitution cannot exceed the actual, provable loss realized by the victims. *United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012). And the causal connection between the defendant's acts and the victim's losses must not be unreasonably extended. *United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012).

That burden is met here. While the government must prove the amount of the loss by a preponderance of the evidence, the only evidence in the record is that the defendant's PTO hours should have been compensated at a prorated hourly salary rate, just as they were for every other employee. The government's estimate is, if anything, conservative: it is certainly questionable whether the defendant was entitled to any compensation at all for several of the PTO hours claimed during the relevant time period, nor has any attempt been made to estimate what might have been paid out during periods for which complete records are unavailable. As a result, the Court finds that the loss calculation proffered by the government is supported by a preponderance of the evidence.

## CONCLUSION

In sum, the Court agrees with the government that based on the evidence before the Court, the appropriate loss calculation figure is $541,895.25.[6]

IT IS ORDERED:

1. The Court's loss calculation figure is $541,895.25.

2. The probation office is directed to consider the Court's loss calculation when preparing its presentence investigation report.

3. Any objection or challenge to these findings shall be made in the context of an objection to the presentence report or a

---

[6] The Court is aware that under 18 U.S.C. § 3664, the probation officer will be required to provide NPS with notice and an opportunity to present evidence relevant to restitution. It is apparent from the evidentiary hearing, however, that NPS has been aware of these proceedings and has cooperated extensively with the government in developing evidence of its losses. It is the Court's opinion that for purposes of restitution, the notice requirements of § 3664 and the Crime Victims' Rights Act, 18 U.S.C. § 3771, have been reasonably complied with. *See In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005).

motion for departure or variance from the Sentencing Guidelines.

Dated this 23rd day of May, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge
